Filed 1/2/24  P. v. Pritchett CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CHARLES EDWARD PRITCHETT, <br><br> Defendant and Appellant. | F085576 <br><br> (Super. Ct. No. VCF167104A) <br><br><br> **OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Tulare County.  Nathan G. Leedy, Judge.

Nicholas Seymour, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Hill, P. J., Levy, J. and Poochigian, J.

## INTRODUCTION

"Appellant Charles Edward Pritchett and his codefendants, Emmanuel Miller and Ellis Jones, were charged and tried in connection with two attempted robberies in Visalia. The first occurred at a Me-n-Ed's Pizza restaurant late at night. The second occurred early the next morning at the home of Mike Thum. During the second incident, appellant shot and paralyzed Thum." (*People v. Pritchett* (Feb. 26, 2009, F053246) [nonpub. opn.] (*Pritchett*).) In 2007, appellant was convicted of the attempted murder of Thum and other offenses, and sentenced to 11 years plus 25 years to life. His sentence was subsequently corrected to eight years plus 25 years to life.

In 2020, appellant filed a petition for resentencing pursuant to Penal Code[1] section 1170.91, subdivision (b), which permits defendants to petition for resentencing when certain military-related trauma was not considered as a mitigating factor at the time of sentencing. In 2023, after numerous continuances, the trial court reviewed appellant's records, conducted an evidentiary hearing, and denied the petition.

On appeal, appellate counsel filed a brief which summarized the facts and procedural history with citations to the record, raised no issues, and asked this court to independently review the record. (*People v. Wende* (1979) 25 Cal.3d 436.) Appellant did not file a supplemental brief on his own behalf. We independently review the record and affirm.

---

[1] All further statutory citations are to the Penal Code.

## FACTS[2]

"Around Thursday, June 29, 2006, appellant was suspended from his job at the subject Me-n-Ed's in Visalia.

"On Sunday, July 2, 2006, between 10:00 [p.m.] and 10:30 p.m., David Malm was walking to the shopping complex where the Me-n-Ed's was located, when he noticed a white Cavalier or Corsica drive by. The driver stopped the car in the middle of the road and looked at Malm. The driver was an African-American male and wore a black 'do-rag' over his head. After the car stopped, it backed up and parked in front of two big-rig trucks by the loading docks at the complex.

"Malm continued walking, passing in front of the Me-n-Ed's and other businesses in the complex, including a Quiznos and Starbucks. Malm soon noticed another African-American male lingering between two pillars. The man was tall and skinny, dressed in dark clothing, and appeared to be wearing a hood or something over his head. After Malm made eye contact with him, the man moved behind one of the pillars. Before Malm entered a mini-market in the complex, he heard some yelling from the area of the Me-n-Ed's. When he exited the market a few minutes later, he saw police cars around the Me-n-Ed's.

"On Sunday nights, the Me-n-Ed's closed at 10:00 p.m. Sometime after closing on July 2, 2006, employee Alix Almares went to take some trash out to the bins in the alleyway at the back of the restaurant. Almares saw an African-American male holding what appeared to be a small handgun. The man had a stocking over his face and was wearing baggy clothing. He chased Almares inside the restaurant and ordered him to get down.

---

[2] The following factual statement is from this court's opinion in *Pritchett*, *supra*, (F053246), that affirmed appellant's convictions in his direct appeal and appellant filed as an exhibit in support of his petition.

3.

"When Almares was on the ground, the man patted him down and took Almares's cell phone from one of his pockets. The man spoke in a 'mad whisper' and said something like, 'stay cool' or 'it will be cool.' Almares told police he recognized the voice as belonging to Emmanuel Miller, a friend of appellant's. Almares also knew Miller by the name 'Manny' and the nickname 'Manifest' from Miller's MySpace page. Miller had come into the Me-n-Ed's several times when appellant was working there. Almares further testified that Miller drove an older, white Chevy.

"Employee Lisa Jacobo was cleaning up the salad bar when she heard screaming and saw Almares being chased from the back of the restaurant by a man with a gun. Jacobo described Almares's assailant as a tall African-American, wearing black clothing and a black ski mask. At that time, the cash register drawers had already been taken out and placed in the office for the supervisor to count them out. Jacobo ran into the office and slammed the door, which automatically locked behind her and could not be opened from the outside without a key. Jacobo told the supervisor not to open the door and called 911. Jacobo heard a male voice outside the door. Twice he stated: 'Open the door before I shoot it open.' Jacobo did not open the door but stayed on the phone speaking with the 911 dispatcher.

"Employee Holly Wood was sweeping up the floor around 10:30 p.m., when an African-American male came in to the restaurant through the front door. He was wearing sunglasses and what looked like a dark green fisherman's hat. He asked to use the restroom. He was only in the restroom about 10 seconds before he came out and left the restaurant through the front door. Wood then saw someone come in through the back door, chasing Almares with a gun. The man with the fisherman's hat returned through the front door and Wood started screaming. He told her to be quiet and asked, 'Do you want to die?' Wood felt an object being held to the side of her head. While she was on the ground, the two intruders ran out of the store. She was unsure whether they ran out the front or the back door.

4.

"On Monday, July 3, 2006, around 5:45 a.m., Mike Thum's roommate, Stephen Jasso, woke up to the sound of breaking glass. Jasso saw a tall African-American male, dressed in a hooded sweatshirt and jeans, standing in his doorway. The man pointed a gun at Jasso and told him not to move. In the meantime, Jasso could hear the sound of somebody 'wrestling' down the hall. Jasso then heard a gunshot coming from Thum's room. The man in Jasso's doorway said, 'What? What?' Jasso heard a man's voice from Thum's room yell, 'Go, go, go!' Jasso then saw three men, including the one in his doorway, run down the hallway and through the kitchen.

"Jasso went to Thum's bedroom and found Thum hunched over his computer desk. Thum's handgun was lying by his feet. Jasso asked, 'What's up? What's up?' Thum replied, "They got me. They got me." Jasso called 911. Jasso was unable to get a good look at the intruders and was never able to identify them.

"Mike Thum testified that he woke up when he heard Jasso's dog barking. He saw somebody walking down the hallway wearing a 'Gilligan, skipper-type hat.' He thought it might be Jasso because Jasso liked fishing. When the person reached the entrance of Thum's room, Thum realized it was someone he did not know. Thum saw that the intruder was an African-American male and was carrying a gun similar in appearance to Thum's own .40–caliber Glock handgun. When Thum started to get up, the man cocked the gun and said, 'Don't try no funny shit.'

"Thum had a couple hundred dollars on his dresser which he offered to the intruder. Thum also had approximately $24,000 in cash, wrapped in a towel and hidden behind his dresser, to which he did not direct the intruder's attention. Meanwhile, a second intruder jumped up, grabbed a bottle from one of the dressers, and hit Thum on the head with it.

"The first intruder directed Thum to come over to him. Thum slammed the bedroom door and thought he locked the door. He then ran over to his computer monitor,

5.

where his handgun was hidden. Thum then felt himself being pulled back and heard a gunshot.

"The gunshot severed Thum's spinal cord and rendered him paralyzed from the waist down. Thum also suffered a head wound from being hit by the bottle. The wound was stitched or stapled closed.

"Following the shooting, Thum was in a coma for about three weeks and on a ventilator for about two months. After he came out of the coma, Visalia Police Detective Randy Lentzer interviewed Thum at the hospital on July 25, 2006. Thum wrote his answers on a magnetic board. When Detective Lentzer asked Thum if he knew the suspects that had shot and robbed him, Thum wrote 'Manny' on the magnetic board.

"Detective Lentzer showed Thum some photographic lineups. Thum picked appellant out from one of the lineups and Miller from another. According to the Detective Lentzer, Thum could not remember who had shot him and who had hit him with the bottle. At trial, Thum identified appellant as the shooter, and Miller as the assailant with the bottle.

"When Detective Lentzer went to Thum's house on the morning of July 3, 2006, he found a 'brick' of money with rubber bands on it next to Thum's bed. It contained around $24,800 in cash. Detective Lentzer also found a .40–caliber Smith and Wesson shell casing on the floor.

"On July 5, 2006, Visalia Police Agent Cory Sumpter came to the UPS store where Miller worked and arrested him for the attempted robbery of the Me-n-Ed's on July 2, 2006. At the time, Miller's white Chevy Cavalier was parked in the parking lot of the UPS store. [Fn. omitted.]

"Around 2:30 p.m., Agent Sumpter, assisted by about 15 officers, executed a search warrant at Miller's apartment. Miller's girlfriend, Karen Lawrence, answered the door and was cooperative. Appellant was found in the living room and arrested. In the living room, the police also found a black 'do-rag' on a shelf and an empty DVD case

6.

labeled 'Strong Arm Robbery' next to the couch.  A BB gun was found on a shelf in the master bedroom.

"After conducting the search, Agent Sumpter took a tape-recorded statement from Lawrence at the police station.  The recording was played to the jury.  In the statement, Lawrence told Agent Sumpter that when she had returned home from work around 5:00 p.m. on Sunday, July 2, 2006, appellant, Miller, and another man she did not know were at the apartment.  All three men left the apartment a few hours later in Miller's white Cavalier.  Before they left, Miller said they were going to the studio where he lays down tracks of his rap lyrics.  The three men did not return to the apartment until early the next morning, around 5:00 [a.m.] or 6:00 a.m.  Lawrence did not know where they had been.  The unidentified man left later that day.  Lawrence saw appellant at the apartment over the next few days before his arrest.

"At trial, Lawrence identified Ellis Jones as the man she did not know at the time of her police statement.  Her testimony also differed from her police statement.  Lawrence claimed for the first time that, after she returned home from work on July 2, 2006, in addition to seeing Miller and Jones at the apartment, she saw a guy named Rassie Harris and two girls.  However, she did not see appellant.  The group left the apartment sometime between 8:30 [p.m.] and 10:00 p.m.  Miller returned alone about an hour later and told Lawrence that he was going to the studio.  He got his notebook and pen and left about ten minutes later.

"Lawrence testified she saw Miller again the next morning when he took her to work, which started around 9:00 a.m.  Miller did not tell her where he had been all night.  Lawrence saw appellant at the apartment on July 3 and July 4, 2006.  It was a common occurrence for him to spend the night at their apartment.

"On the night of July 6, 2006, officers with the San Jose Police Department went to an apartment complex on the campus of San Jose State University.  Jones was seen running out of the complex and was stopped and detained by one of the officers.  Officers

7.

searched Jones's Ford Explorer and found a software box containing a hand-drawn floor plan of the subject Me-n-Ed's. [Fn. omitted.] The officers also searched an apartment in the complex and found a backpack. Inside the backpack, the officers found a wallet containing two driver's licenses. One was for Miller and the other was for Jones. There was also a notebook inside the backpack. The word 'Manifest' was written on the cover."

**Defense Evidence**

"Appellant testified. After he graduated from high school in 2002, he joined the Army National Guard. Over the next few years, he was assigned to active duty in Iraq and later became an active duty recruiter for the Army. After being released from active duty in early 2006, appellant returned to Visalia to live with his mother and stepfather. He was supposed to return to Iraq in July 2006.

"Appellant went to work for Me-n-Ed's in March 2006. After returning to Visalia, appellant ran into Miller, with whom he had been friends in high school. They began to see each other pretty often, at least three times a week. Miller would often come to the Me-n-Ed's and eat there. In June 2006, Miller would visit appellant at the Me-n-Ed's at least twice a week. Occasionally he would pick up appellant from work when appellant worked the night shift. On those occasions, Miller would sometimes come in about 15 minutes before appellant was to get of work and just hang out and talk to everybody. Miller visited most often when appellant was working the dayshift.

"Appellant was suspended from his employment with Me-n-Ed's on June 29 or June 30, 2006. A female employee had falsely accused him of hitting her, and after his suspension, appellant was planning to come in to talk to the manager about the accusation. Appellant was not irritated at the manager or mad that he had been suspended before he had a chance to tell his side of the story.

"Appellant saw Miller the Friday after his suspension around 5:00 [p.m.] or 6:00 p.m. They drove up to San Jose in Miller's car to visit Miller's friend, Jones. Jones

8.

had a computer program for recording rap songs that Miller was interested in. When they got to San Jose around 9:30 [p.m.] or 10:00 p.m., they met up with Jones and some of his friends and went to a few nightclubs. Around 3:30 a.m., appellant, Miller, and Jones headed back to Visalia. Miller and Jones dropped appellant off at his house early in the morning.

"Appellant slept late and did not wake up until sometime between 1:00 [p.m.] and 5:00 p.m. on Saturday, July 1, 2006. He woke up when his girlfriend, Leslie Casillas, called him. Leslie and her younger sister, Jenny Casillas, then came over and hung out at appellant's house until they went out around 8:00 p.m. to go to a party. After going to two parties that night, Leslie and appellant returned to his house to sleep around 2:00 a.m.

"On Sunday, July 2, 2006, appellant woke up around 10:00 a.m. when Jenny called to speak with Leslie. Leslie went home around 1:00 [p.m.] or 2:00 p.m. After Leslie left, Miller came over and drove appellant to Miller's apartment. The only people there were appellant, Miller, and Jones. Appellant stayed until around 6:00 p.m., and then Miller drove appellant home.

"About an hour later, Leslie came to pick up appellant. They went to the store and then returned to Leslie's house around 8:00 p.m. They went to Leslie's room and spent the evening watching DVD's. Jenny joined them later on. Appellant and Leslie went to sleep around 11:30 p.m. The following morning, appellant returned to his own house sometime between 9:30 [a.m.] and 10:30 a.m.

"After he returned home on Monday, July 3, 2006, appellant just hung around the house all day. Miller called late Monday night and asked if he could use the Internet at appellant's house.

"On Tuesday, July 4, 2006, Miller and Jones arrived at appellant's house to use the Internet between midnight and 1:00 a.m. The three hung out together all night, using the Internet and talking. Appellant, Miller, and Jones left around 6:00 a.m., when appellant's mother and his stepfather returned home from work.

9.

"Appellant had Miller and Jones drop him off at the house of his friend, Desiree, because he wanted to avoid his mother who would likely be angry with him for having his friends over at the house. Appellant stayed at Desiree's house from about 6:00 a.m. until 1:00 p.m., and then returned home. Around 4:00 p.m., Miller picked up appellant and took him back to Miller's apartment. Jones and Miller's girlfriend, Lawrence, were both at the apartment. Appellant kicked back while Miller worked on recording some rap lyrics. Jones was working on the computer and burned a CD for Miller. Jones then started packing because he had classes the next day in San Jose.

"Appellant, Miller, and Jones left Miller's apartment around 1:00 a.m., on Wednesday, July 5, 2006, and drove downtown to see if any nightclubs were open. Nothing was happening, so they decided to hop on the freeway and take Jones back to San Jose. They arrived in San Jose around 5:30 [a.m.] or 6:00 a.m. After they dropped off Jones, appellant and Miller turned around and came back to Visalia, arriving at Miller's apartment around 10:00 a.m. Miller ran to change his clothes because he was late for work. Miller told appellant to go ahead and sleep. Appellant lay down on the couch. The next thing he remembered was the police coming in and taking him down to the police station.

"Agent Sumpter interrogated appellant about the Me-n-Ed's robbery. Appellant told Agent Sumpter he was home on the night of Sunday, July 2, 2006, and did not mention being at Leslie's house. Appellant testified he was not being untruthful and explained he was confused and thought Agent Sumpter was asking him about Monday night. Appellant was being truthful when he denied any involvement in [the] Me-n-Ed's robbery and the home invasion at Thum's house.

"Leslie and Jenny Casillas both testified and corroborated appellant's testimony concerning his activities between Saturday, July 1, 2006, and Monday, July 3, 2006.

"Thum's neighbor, Joseph Kersten, testified that he frequently observed 'a lot of traffic in and out' of Thum's house. Often cars would pull up and people would go inside the house and then come back out and leave five minutes later."

## Convictions

On April 13, 2007, after a jury trial, appellant was convicted of count 1, conspiracy to commit robbery of Me-n-Ed's (§§ 182, 211); count 3, second degree commercial burglary of Me-n-Ed's (§ 459); count 6, attempted murder of Thum (§§ 664, 187), with the special allegations found true that appellant personally and intentionally discharged a firearm causing great bodily injury (§12022.53, subd. (d)), personally inflicted great bodily injury (§12022.7), and personally caused paralysis (§ 12022.9, subd. (b)(1)); count 8, attempted home invasion robbery of Thum (§§ 664, 211); and count 9, first degree burglary of Thum and Jasso (§ 459), with additional firearm and great bodily injury enhancements. The jury found the premeditation allegation for attempted murder was not true.

## Sentencing

According to the probation report, appellant stated he used alcohol a few times a month, a couple of beers per occasion, he used marijuana a couple of times per week, and denied any other drug or alcohol use. Appellant further reported he was in good physical and mental health with no disabling handicaps.

The probation report stated there was one mitigating factor, that he had no prior record of criminal conduct. There were aggravating factors that the crimes involved great bodily harm and great violence, the manner the crimes were carried out indicated planning, the crimes involved separate acts of violence and were committed in different times and places, and he engaged in violent conduct that indicated a serious danger to society.

On June 7, 2007, the trial court held the sentencing hearing. Defense counsel argued appellant should not have been convicted because he had an alibi, and questioned

11.

the credibility of the identification. Counsel noted appellant had recently returned from serving in Iraq.

Appellant was sentenced to seven years for count 6, attempted murder, plus 25 years to life for the attached firearm enhancement (§ 12022.53, subd. (d)); a consecutive midterm of three years for count 8, attempted home invasion robbery; and a consecutive one-year term for count 1, conspiracy, with the other sentences stayed pursuant to section 654.

## Direct Appeal

In *Pritchett*, *supra*, F053246, this court rejected appellant's contentions that the trial court erroneously denied his motion to severe the Me-n-Ed's counts from the home invasion counts; the evidence was insufficient to support his conviction for commercial burglary in count 3; the evidence was insufficient to support his conviction for conspiracy to commit robbery in count 1; and the prosecution failed to disclose material evidence in violation of his due process rights under *Brady v. Maryland* (1963) 373 U.S. 83.

We found the three-year term imposed for count 8 should be stayed pursuant to section 654, remanded for recalculation of his credits, and ordered correction of the abstract of judgment.

An amended abstract was subsequently filed that corrected appellant's sentence to seven years for count 6, attempted murder, with a consecutive term of 25 years to life for the attached firearm enhancement, plus one year (one-third the midterm) for count 1, conspiracy, with the sentences for the remaining offenses stayed pursuant to section 654.

## APPELLANT'S PETITION

On February 21, 2020, appellant, represented by counsel, filed a petition for resentencing pursuant to section 1170.91, subdivision (b)(1), and alleged he was a veteran of the United States Armed Forces, he was sentenced to prison in 2007, the sentencing court did not consider "[h]is [posttraumatic stress disorder (PTSD)] incurred during his military service," and he was entitled to an evidentiary hearing and

12.

resentencing under section 1170.91 subdivision (b)(1). Appellant filed the transcript of his sentencing hearing and a copy of the opinion from his direct appeal as supporting exhibits.

**Evidentiary Hearing**

On August 19, 2022, the trial court held an evidentiary hearing on appellant's section 1170.91 petition. The court stated it had reviewed records from appellant's trial and sentencing, and this court's opinion that affirmed the judgment on direct appeal. Appellant's counsel called three witnesses.

Appellant's sister testified about family strife and fighting between their parents when they were children. Their mother hired someone to shoot at and attempt to kill their father. Their mother was arrested, convicted, and sentenced to prison, and the case was covered on the news. The children then lived with their father and stepmother. Their father and stepmother appeared on a talk show and were interviewed about the mother's conviction for attempted murder. They displayed a photograph of appellant and his sister on television, and the children were embarrassed by the publicity. Their stepmother was verbally and physically abusive to appellant, and he ran away after she beat him with a belt. His sister also left home and did not see appellant on a regular basis.

Justin Anderson testified he knew appellant when they were in high school. They were trained together in the Army, and served as supply truck drivers in the same unit in Iraq. During one mission, they were ambushed when their truck was hit by explosives. Anderson's right leg was crushed. Appellant was not injured and he got Anderson out of the truck. Anderson was seriously injured and discharged. Appellant served his full deployment of one year. Anderson testified that after appellant returned home, they would talk and sometimes hang out, and he did not see anything wrong in appellant's behavior. Anderson testified he was "surprised" when he learned about appellant's

13.

convictions in this case because "I didn't see the signs," and he was sorry that he didn't realize appellant "needed help."

Dr. Teo Ernst, a clinical psychologist, testified as an expert for appellant, and reviewed appellant's military and prison records, the probation report from his trial, interviewed appellant for over seven hours, and administered psychological tests. Ernst also interviewed appellant's wife, his sister, his mother and stepmother, his father, Anderson, and another soldier who served with him.

Ernst testified to his opinion that appellant "was suffering from post-traumatic stress disorder as a consequence of his military experience and combat exposure." He also believed appellant "formed an alcohol use disorder and a cannabis use disorder as a consequence of post-traumatic stress disorder." He examined appellant in 2021, but believed his conclusions were retroactive to when appellant committed the offenses. Ernst was not sure if he read the opinion that affirmed appellant's convictions, and he was not familiar with appellant's trial testimony that he was not involved in committing the offenses.

The prosecution did not present any evidence.

**The Parties' Arguments**

On November 10, 2022, the trial court heard arguments from the parties.

Appellant's counsel argued that under the then-applicable version of section 1170.91, appellant was eligible for resentencing because the statute was intended to help veterans who suffered from PTSD, the hearing evidence established he suffered trauma when he was a child and in the Army, he was sentenced to both indeterminate and determinate terms, and he could be resentenced on the determinate terms.

Appellant submitted a post-hearing brief that was supported by Ernst's report that appellant "was adversely impacted by family dysfunction and disrupted/inadequate relationships with parent figures. This childhood injury increased his risk of developing psychological disorders, including PTSD, in adulthood," he was "exposed to significant

14.

combat psychological trauma during his 2003 deployment to Iraq," and "[a]s a consequence of combat trauma, [he] developed posttraumatic stress disorder" and "further developed a substance use disorder due to military trauma and PTSD."

The district attorney argued that Ernst admitted he never considered the trial evidence about the offenses or determined whether appellant's alleged PTSD was a factor in committing the offenses. The district attorney acknowledged that section 1170.91 required the court to consider a veteran's PTSD as a mitigating factor, but the sentencing court imposed the midterms even though there were multiple aggravating factors. In addition, there was no evidence that appellant's condition "actually played any factor in the two different violent criminal activities that [appellant] committed that got him the sentence that's now at issue."

The district attorney further noted that section 1170.91 had been amended, effective January 1, 2023, and the amended statute specially excluded relief if a prisoner had been convicted of a "super strike" offense, which included appellant's conviction for attempted murder.

Appellant's counsel argued the trial court had to decide the motion under the then-applicable version of section 1170.91. Counsel further argued appellant could no longer be convicted of attempted murder as a result of amendments to sections 188 and 189 that redefined the offense. The district attorney replied appellant was eligible for resentencing for attempted murder under the amendments to the felony-murder rule because he was identified at trial as the person who shot the victim, and he was not convicted as an aider and abettor.[3]

---

[3]    Appellant did not file a motion for resentencing pursuant to section 1172.6 and claim he could not be convicted of attempted murder after the amendments to sections 188 and 189.

## The Trial Court's Denial of the Petition

Also on November 10, 2022, the court denied appellant's petition and made the following findings:

"[T]his boils down to the court's exercise of discretion, whether I think it would be appropriate and under these circumstances to resentence [appellant].

"As a threshold matter, I don't have any doubt here that [appellant] is validly diagnosed with post-traumatic stress disorder. That testimony and evidence that was received at the hearing was essentially unrebutted.

"The problem in my mind for [appellant] is that it is very difficult for me to see much of a connection between the diagnosis of post-traumatic stress disorder and the conduct in this case, at least … a type of connection that would weigh heavily in his favor when considered against the gravity of the offense here.

"Just by way of example, this is not a situation where [appellant] was self-medicating and got into a DUI accident. It's not the type of situation where there's some sort of spontaneous assaultive conduct that is related to hypervigilance or paranoia or anything along those lines.

"This is a case where [appellant] was involved in a conspiracy to rob multiple victims at different locations, involved planning and premeditation and a careful selection of victims, including his former place of employment and another victim in his own home who posed … a tempting target because of the amount of cash that he had on hand is just not convincing to me that post-traumatic stress disorder would mitigate this type of criminal activity and these type of choices being made over some period of time.

16.

"And as I said before, on the other side of the scale is the grievous harm suffered by Mr. Thum in this case. He was minding his own business in his own home when it was invaded, and he was shot trying to defend himself. He spent weeks in a coma. He spent months on a ventilator. He's paralyzed for the rest of his life. His whole life trajectory is dramatically altered for the worse, and all that said, [appellant] did not even receive the aggravated term here.

"So on balance, I don't think it would be a just exercise of my discretion to resentence [appellant] after having considered all the evidence that was received at the hearing."

On January 6, 2023, appellant filed a notice of appeal.

## DISCUSSION

As noted above, appellate counsel filed a *Wende* brief with this court. The brief also includes counsel's declaration that appellant was advised he could file his own brief with this court. This court advised appellant by letter that he could file a supplemental letter or brief raising any arguable issues. Appellant has failed to do so.

## A. Section 1170.91

Section 1170.91 was enacted in 2014 and became effective on January 1, 2015. (*People v. King* (2020) 52 Cal.App.5th 783, 788; *People v. Sherman* (2023) 91 Cal.App.5th 325 (*Sherman*).) "The original statute merely required courts to consider as a mitigating factor *for determinate sentencing* certain specified qualifying conditions the defendant may be suffering as a result of his or her military service–sexual trauma, traumatic brain injury, posttraumatic stress disorder, substance abuse, or mental health problems. [Citations.] As amended, this sentencing provision is now contained in section 1170.91, subdivision (a)." (*Sherman*, at p. 329, italics added.)

"In 2018, the Legislature added subdivision (b) to section 1170.91. Subdivision (b) authorizes retrospective relief for previously sentenced criminal

17.

defendants who may suffer from one of the qualifying conditions as a result of their military service.  As originally enacted, subdivision (b) allowed a defendant who was sentenced before January 1, 2015, to petition the court for a recall of the sentence and request resentencing 'pursuant to subdivision (a)' if his or her qualifying condition 'was not considered as a factor in mitigation at the time of sentencing.'  [Citation.]  Like subdivision (a), *subdivision (b) originally applied only to defendants who were eligible for determinate sentences*."  (*Sherman*, *supra*, 91 Cal.App.5th at p. 329, italics added.)

"In 2022, the Legislature amended the statute again," effective on January 1, 2023.  (*Sherman*, *supra*, 91 Cal.App.5th at p. 330.)  The amendment "both expanded and restricted eligibility for relief.  In relevant part, it expanded subdivisions (a) and (b) to *include those serving indeterminate sentences*; it eliminated the requirement that the defendant must have been sentenced before January 1, 2015, to be eligible for resentencing; and it added a provision explicitly stating that subdivision (b) 'shall apply retroactively' [citation].  At the same time, however, it restricted eligibility by adding subdivision (c), a carve-out provision stating that '[t]his section does not apply to a person convicted of, or having one or more prior convictions for, an offense specified in clause (iv) of paragraph (C) of paragraph (2) of subdivision (e) of Section 667 or an offense requiring registration pursuant to subdivision (c) of Section 290.' "  (*Sherman*, at p. 330, italics added.)  The exclusionary language in subdivision (c) is retroactive to cases pending on appeal.  (*Sherman*, at pp. 330, 333−334.)

As amended, there is a three-step process for a prisoner who seeks resentencing under section 1170.91.  First, the prisoner files a petition for resentencing to allege he or she "may be suffering" from military service-related trauma.  (§ 1170.91, subd. (b)(1).)  Second, the trial court must hold a hearing to determine whether the petitioner "satisfies the criteria," meaning the person suffers trauma "as a result of the person's military service" and the other statutory provisions.  (*Id*. at subds. (b)(1), (b)(3), (c).)  Third, "[i]f

the person satisfies the criteria, the court may, in the interest of justice," resentence the petitioner. (*Id*. at subd. (b)(3).)

## B. Analysis

In 2022, when the trial court held the evidentiary hearing on appellant's petition, the operative version of section 1170.91, subdivision (b) only permitted resentencing of "defendants who were eligible for determinate sentences." (*Sherman*, *supra*, 91 Cal.App.5th at p. 329.) Appellant was sentenced to determinate terms for his convictions on the substantive offenses, and received an indeterminate term for the firearm enhancement attached to the attempted murder conviction. (See *People v. Estrada* (2020) 58 Cal.App.5th 839, 842–843.) He was thus eligible for resentencing on the substantive offenses. While the court found appellant suffered from a service-related PTSD condition, it made extensive findings and declined to exercise its discretion to resentence him based on the record of how he committed the attempted murder and the robberies. The court did not abuse its discretion in denying relief.

Also, as explained above, the 2023 amendments to section 1170.91 have been held retroactive to cases pending on appeal. (*Sherman*, *supra*, 91 Cal.App.5th at pp. 333−334.) While the amendments eliminated the distinction between determinate and indeterminate terms, they expressly rendered an otherwise-eligible defendant ineligible for resentencing if he or she was "convicted of, or having one or more prior convictions for, an offense specified in clause (iv) of paragraph (C) of paragraph (2) of subdivision (e) of Section 667…." (§ 1170.91, subd. (c).)

The violent felonies encompassed in section 667, subdivision (e)(2)(C)(iv) " 'are known as "super strikes" and include murder, attempted murder, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, and any serious or violent felony punishable by death or life imprisonment.' " (*People v. Moine* (2021) 62 Cal.App.5th 440, 449−450; *Sherman*, *supra*, 91 Cal.App.5th at p. 328.) Appellant was convicted of attempted murder and is

categorically ineligible for resentencing under the now-applicable version of section 1170.91, subdivision (c).  (*Sherman*, at p. 334.)

After independent review of the record, we find no reasonably arguable factual or legal issues exist.

## DISPOSITION

The court's order of November 10, 2022, denying appellant's petition is affirmed.